UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | |
|---|---|
| U.S. Commodity Futures Trading Commission,<br><br>                    Plaintiff,<br><br>vs.<br><br>Feisal Sharif,<br><br>                    Defendant. | Case No. 3:12-cv-01670-SRU<br><br>Hon. Stefan R. Underhill<br><br>CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY AND OTHER EQUITABLE RELIEF |

## I. INTRODUCTION

On November 26, 2012, Plaintiff Commodity Futures Trading Commission

("Commission" or "CFTC") filed a Complaint against Defendant Feisal Sharif ("Defendant")

seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for

violations of Sections 4b(a)(2)(i)-(iii) (for acts before June 18, 2008), 4b(a)(1)(A)-(C) (for acts

on or after June 18, 2008), 4o(1), and 4m(1) of the Commodity Exchange Act (the "Act"), 7

U.S.C. §§ 6b(a)(2)(i)-(iii), 6b(a)(1)(A)-(C), 6o(1) and 6m(1) (2006 and Supp. V 2012).[1]   (Dkt.

No. 1.)  The Court entered a Consent Order for Preliminary Injunction against Defendant on

February 7, 2013.  (Dkt. No. 26.)

---

[1]      All Sections of the Act that have been amended, in relevant part, by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 Pub. L. No. 111-203, Title VII §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010) or the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 §§ 13102-13204, 122 Stat. 1651 (enacted June 18, 2008), are cited as follows: "Section x of the Act, 7 U.S.C. § x (Supp. V 2012)."  All Sections of the Act that were neither amended by the CRA nor Dodd-Frank Act in relevant part are cited as follows: "Section x of the Act, 7 U.S.C. § x (2006)."

## II. CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendant without a trial on the merits or any further judicial proceedings, Defendant:

1.    Consents to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant ("Consent Order");

2.    Affirms that he has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3.    Acknowledges service of the summons and Complaint;

4.    Admits the jurisdiction of this Court over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (Supp. V 2012);

5.    Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act, 7 U.S.C. §§ 1, et seq.;

6.    Admits that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006);

7.    Waives:

(a)  any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. §§ 148.1 et seq. (2012), relating to, or arising from, this action;

(b)  any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868

2

(1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this action;

(c)  any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d)  any and all rights of appeal from this action;

8.      Consents to the continued jurisdiction of this Court over him for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendant now or in the future resides outside the jurisdiction of this Court;

9.      Agrees that he will not oppose enforcement of this Consent Order by alleging that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waives any objection based thereon;

10.     Agrees that neither he nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect his: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission is not a party.  Defendant shall undertake all steps necessary to ensure that all of his agents and/or employees under his authority or control understand and comply with this agreement; and

11.     Admits to all of the findings made in this Consent Order and all of the allegations in the Complaint.  Further, Defendant agrees and intends that the allegations contained in the Complaint and all of the Findings of Fact and Conclusions of Law contained in this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of: (a) any current or subsequent bankruptcy proceeding filed by, on behalf of, or against Defendant; (b) any proceeding pursuant to Section 8a of the Act, as amended, 7 U.S.C. § 12a, and/or Part 3 of the Regulations, 17 C.F.R. §§ 3.1 *et seq.* (2012); and/or (c) any proceeding to enforce the terms of this Consent Order.

12.     Agrees to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 70 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against him, whether inside or outside the United States, and

13.     Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendant in any other proceeding.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (Supp. V 2012), as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

## A. Findings of Fact

### 1. The Parties To This Consent Order

14.     **Plaintiff Commodity Futures Trading Commission is an** independent federal regulatory agency that is charged by Congress with administering **and enforcing the Act**, as amended, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2013).

15.     **Defendant Feisal Sharif** currently resides in Branford, Connecticut.  From at least January 2007 and until September 13, 2012 ("relevant period"**), Defendant** also resided in Wolcott and /or West Hartford, Connecticut.  He is the manager/**member**, principal and registered agent of First Financial LLC ("First Financial" or the "**Pool**"), which he operated from his residence.  Defendant registered First Financial as a domestic limited **liability** company in Connecticut in 2003.  He was previously registered with the Commission as an associated person ("AP") and principal of Sharif Capital Management LLC ("Sharif **Capital**") from August 2003 to July 2007.  Sharif Capital was a registered commodity pool operator ("CPO") and commodity trading advisor ("CTA") from September 2003 to July 2007.  First Financial has not been registered with the Commission in any capacity.  Defendant has not been registered in any capacity with the Commission since July 2007.

### 2. Defendant's Operation of First Financial

16.     First Financial is a Connecticut limited liability company created by Defendant on June 5, 2003, with a principal place of business located in Wolcott, Connecticut.  First Financial's most recent principal place of business was Branford, Connecticut.  First Financial is a commodity pool created by Defendant, in part, for the purpose of trading commodity futures

("futures") on behalf of at least fifty members of the general public residing in the United States ("Pool Participants").  Defendant is First Financial's unregistered CPO.

17.     During the relevant period, Defendant operated a Ponzi scheme by which he fraudulently solicited approximately $5.4 million from Pool Participants to invest with First Financial for the purpose of trading futures.

18.     During the relevant period, Defendant controlled the day-to-day operations of First Financial, including making the Pool's trading decisions, soliciting and accepting funds from prospective Pool Participants, opening a bank account in the Pool's name, and opening trading accounts at registered futures commission merchants ("FCM") in the Pool's name to trade futures on behalf of the Pool Participants.

19.     In January 2004, Defendant opened a trading account in the name of First Financial at Velocity Futures LLC ("Velocity"), a registered FCM.  In this account, Defendant traded futures, including but not limited to contracts in the e-Mini S&P, e-NASDAQ and e-Russell.

20.     In July 2008, Defendant opened a trading account in the name of First Financial at TradeStation Securities Inc. ("TradeStation"), a registered FCM.  In this account, Defendant traded futures, including but not limited to contracts in the e-Mini S&P and e-Russell.

21.     During the relevant period, Defendant solicited and received approximately $5.4 million from at least fifty Pool Participants for the purpose of trading futures in the Pool.

22.     Defendant solicited Pool Participants and prospective Pool Participants to write checks, wire monies, or transfer funds to a First Financial bank account telling them that their money would be pooled with funds from other Pool Participants and that Defendant would use the money to trade, among other things, futures on behalf of all Pool Participants.  In order to

transmit funds to the pool, Defendant instructed Pool Participants to either give him checks made payable to First Financial or to send funds directly to a bank account in the name of First Financial.

23.     One Pool Participant, after having invested with the **Pool for** many months, believing the investment to be very profitable, executed a "Financial Investment Contract Agreement" (hereinafter "Agreement") on August 17, 2011 with Defendant to increase his investment in the Pool.

24.     Pursuant to the Agreement, Defendant, as the manager of First Financial, was prohibited from investing First Financial funds in any "personal expenses" and that any account management fee would be "...fifteen (15) percent of the Client's monthly gross profit amount" and in the event of no monthly profit the fee would be waived for that particular month.

**3.  Defendant's Solicitations and Misrepresentations to Pool Participants**

25.     Beginning at least as early as January 2007, Defendant began soliciting prospective Pool Participants to invest in the Pool.  Defendant met with some Pool Participants to show them he was trading futures in the Pool.

26.     Thereafter, in order to induce some prospective Pool Participants to invest in the Pool, Defendant orally promised some prospective Pool Participants a guaranteed monthly return of at least 1% and sometimes up to 15% on the prospective Pool Participants' principal if they invested in the Pool.

27.     These promises by Defendant of a guaranteed monthly return of at least 1% and sometimes up to 15% to some of the prospective Pool Participants were materially false and misleading.

28.     Pursuant to the Agreement, Defendant represented that the past performance of First Financial was:

> "5 Year Net Returns:
> 2006   20%
> *2007   27%
> *2008   21%
> *2009   19%
> *2010   18%
> *2011   11%   (January to July)

The asterisk (*) indicates each year in which the U.S. economy and the global economy was in a deep recession."

29.     These representations made by Defendant to this Pool Participant in the Agreement regarding the past performance of First Financial for 2007 through 2011 were materially false and misleading. In fact, from 2007 through 2011 the Pool net returns never reached these levels of profit, and most often the Pool lost money.

30.     Further, pursuant to the Agreement, Defendant represented to at least one Pool Participant that he would receive a return rate of not less than 2.25% per month for the entire term of the Agreement.

31.     This representation made by Defendant to this Pool Participant regarding the monthly rate of return that this Pool Participant would receive was materially false and misleading.

32.     Defendant made the oral misrepresentations to prospective Pool Participants regarding guaranteed returns as well as the misrepresentations in the Agreement to the one Pool Participant concerning First Financial's past performance as well as the monthly rate of return that this Pool Participant would receive knowing them to be false or with reckless disregard as to their truth.

### 4. Defendant Issued False Account Statements to Pool Participants

    a. The False First Financial Account Statements

33.    Defendant prepared and sent, by U.S. Mail, monthly **First F**inancial account statements to Pool Participants purporting to show the net value **of their inv**estment in the Pool.

34.    The monthly First Financial account statements that Defendant provided to Pool Participants for the most part consistently reflected that the Pool **Participants'** investments were profitable.

35.    These monthly First Financial account statements **prepared** by Defendant are materially false and misleading. Defendant did not invest all of the **Pool** Participants' funds entrusted to him in futures or deposit them into trading accounts in **the** name of First Financial; rather, Defendant only traded approximately 25% of the Pool Participants' funds. Further, of those funds that Defendant traded, Defendant lost the vast majority of **those** funds and the trading accounts were seldom profitable on a monthly basis. Therefore, the representations of monthly and yearly profitable returns on the First Financial account statements, which Defendant provided to Pool Participants, were false.

36.    Defendant made the misrepresentations in the First Financial account statements knowing them to be false or with reckless disregard as to their truth.

    b. The False Velocity and TradeStation Account Statements

37.    Further, in order to entice Pool Participants to remain invested in the Pool and/or to make additional investments into the Pool, Defendant fabricated **trading** account statements from Velocity and TradeStation. He showed the fabricated trading account statements to Pool Participants to falsely assure them that he had not lost their funds and that their funds remained safe in the Pool's trading accounts.

38.     For example, in 2010, Defendant approached one Pool Participant about making a larger investment in the Pool. During this meeting, the Pool Participant asked Defendant to verify the amount of money in the First Financial trading accounts. In response to the Pool Participant's inquiry, Defendant showed the Pool Participant an account statement from Velocity that purportedly showed a balance of $861,036.08 in First Financial's trading account at Velocity as of March 1, 2010. Based on this representation the Pool Participant invested an additional $100,000 in the Pool.

39.     Unknown to the Pool Participant, the March 2010 Velocity account statement was false. In reality, the balance of First Financial's trading account was $1,858.00 as of March 1, 2010.

40.     Thereafter in 2012, after the Pool Participant made a redemption request to Defendant for a return of his principal that went unfulfilled, Defendant showed the Pool Participant's spouse an account statement from Velocity that showed a balance of $2,265,297.94 in First Financial's trading account at Velocity as of May 31, 2012.

41.     Again, unknown to the Pool Participant, the May 2012 Velocity account statement was false. In reality, the balance of First Financial's trading account was $1,192.48 as of May 31, 2012.

42.     Defendant later admitted to the Pool Participant that the March 2010 and May 2012 Velocity account statements Defendant had shown him were false.

43.     Defendant made the misrepresentations in the Velocity and TradeStation account statements knowing them to be false or with reckless disregard as to their truth.

### 5. Defendant Misappropriated Pool Participant Funds

44.     Rather than use all of the Pool Participants' funds entrusted to him to trade futures or return those funds back to the Pool Participants, Defendant misappropriated $900,000 of Pool Participants' funds for his personal use.  Specifically, during the relevant period, Defendant solicited $5.4 million from Pool Participants, lost $1.32 million in futures trading accounts in the name of First Financial held at Velocity and TradeStation, and paid out $3.17 million to certain Pool Participants as fictitious "profits" or returns of principal.  The difference between those amounts is the $900,000 that is unaccounted for and which Defendant misappropriated.

45.     On multiple occasions, during the relevant period, Defendant wired or transferred Pool Participants' funds from First Financial's bank account to his personal bank account. Further, Defendant used the First Financial bank account as his personal ATM, withdrawing cash whenever he needed it, and paying thousands of dollars for gifts and his personal living expenses.

46.     Moreover, the value of these transfers far exceeds the amount of any commissions and/or fees that Defendant told Pool Participants he would be paid or indeed, that he was entitled to take for trading performance because the Pool's trading accounts were seldom profitable and suffered overall losses of $1.32 million.

47.     In or about June 2012, a Pool Participant made numerous redemption requests to Defendant for a return of his remaining principal in First Financial.  In response, Defendant provided the Pool Participant with multiple checks drawn on First Financial's bank account. When the Pool Participant attempted to deposit the checks with his bank, those checks bounced for insufficient funds.  Thereafter, Defendant met with the Pool Participant and admitted that he was operating a Ponzi scheme.

### B. Conclusions of Law

#### 1. Jurisdiction and Venue

48.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (Supp. V 2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

49.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (Supp. V 2012), because the Defendant resides in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

#### 2. Futures Fraud and Fraud as a Commodity Pool Operator by Misrepresentations, False Account Statements, and Misappropriation of Pool Participant Funds

50.     By the conduct described in paragraphs 16 through 47 above, Defendant cheated and defrauded, or attempted to cheat and defraud, and willfully deceived, or attempted to deceive, and otherwise engaged in a course of business that operated as a fraud on his Pool Participants and prospective Pool Participants by, among other things,  knowingly or recklessly: making fraudulent misrepresentations, creating and issuing false account statements, and misappropriating Pool Participant funds while operating First Financial, in violation of Sections 4b(a)(2)(i)-(iii) (for acts before June 18, 2008), 4b(a)(1)(A)-(C) (for acts on or after June 18, 2008), and 4o(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii), 6b(a)(1)(A)-(C), and 6o(1) (2006 and Supp. V 2012).

### 3.  Failure to Register as a CPO

51.    Prior to July 15, 2011, Section 1a(5) of the CEA, 7 U.S.C. § 1a(5) (Supp. II 2009),

defined a Commodity Pool Operator ("CPO") as

> any person engaged in a business that is of the nature **of an in**vestment trust,
> syndicate, or similar form of enterprise, and who, in connection **ther**ewith, solicits,
> accepts, or receives from others, funds, securities, or property, either directly or
> through capital contributions, the sale of stock or other **forms** of securities, or
> otherwise, for the purpose of trading in any commodity **for future** delivery on or
> subject to the rules of any contract market or derivatives transaction execution
> facility, except that the term does not include such person not within the intent of the
> definition of the term as the Commission may specify by rule, regulation, or order.

52.    Since July 16, 2011, Section 1a(11) of the CEA, 7 U.S.C. § 1a(11) (Supp. V 2012),

defines a CPO as any person who is

> (i)    engaged in a business that is of the nature of a commodity pool, investment
>        trust, syndicate, or similar form of enterprise, and **who,** in connection
>        therewith, solicits, accepts, or receives from others, **funds,** securities, or
>        property, either directly or through capital contributions, **the** sale of stock or
>        other forms of securities, or otherwise, for the **purpose** of trading in
>        commodity interests, including any—
>
> > (I)   commodity for future delivery, security futures product, or swap;
> > (II)  agreement, contract, or transaction described in section 2(c)(2)(C)(i) of
> >       this title or section 2(c)(2)(D)(i) of this title;
> > (III) commodity option authorized under section 6c of this title; or
> > (IV)  leverage transaction authorized under section 23 of this title; or
>
> (ii) ·   who is registered with the Commission as a commodity pool operator.

53.    Section 4m(1) of the CEA, 7 U.S.C. § 6m(1) (2006), provides that it is unlawful

for any CPO, unless registered, to make use of the mails or any means or instrumentality of

interstate commerce in connection with its business as a CPO.

54.    By the conduct described in paragraphs 16 through 47 above, Defendant acted as

a CPO during the Relevant Period without registering with the Commission and did not qualify

for a registration exemption under the Act, the Act as amended or the Regulations. As such,

Defendant has violated Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

55.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that

the Defendant will continue to engage in the acts and practices alleged in the Complaint and in

similar acts and practices in violation of the Act and Regulations.

## IV.  PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

56.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c

of the Act, 7 U.S.C. § 13a-1 (Supp. V 2012), Defendant is permanently restrained, enjoined and

prohibited from directly or indirectly from violating Sections 4b(a)(1)(A)-(C), 4o(1), and 4m(1)

of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o(1) and 6m(1) (2006 and Supp. V 2012);

57.     Defendant is also permanently restrained, enjoined and prohibited from directly or

indirectly:

      a.     Trading on or subject to the rules of any registered entity (as that term is

            defined in Section 1a of the Act, 7 U.S.C. § 1a (Supp. V 2012));

      b.     Entering into any transactions involving commodity futures, options on

            commodity futures, commodity options (as that term is defined in

            Regulation 1.3 (hh), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"),

            security futures products, foreign currency (as described in Sections

            2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and

            2(c)(2)(C)(i) (Supp. V 2013)) ("forex contracts"), and/or swaps (as that term

            is defined in Section 1a(47) of the Act,  7 U.S.C. § 1a(47) (Supp. V 2013),

            and as further defined by Regulation 1.3(xxx) (2012), 17 C.F.R. §

1.3(xxx) (2013)) for his own personal account or for any account in which he has a direct or indirect interest;

c. Having any commodity futures, options on **commodity** futures, commodity options, security futures products, forex **contracts, an**d/or swaps traded on his behalf;

d. Controlling or directing the trading for or on **behalf** of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, forex contracts and/or swaps;

e. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps;

f. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and

g. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2013)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a (Supp. V 2012)) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation

4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013).

## V. STATUTORY AND EQUITABLE RELIEF

**A.  Restitution**

58.    Defendant shall pay restitution in the amount of two million, two-hundred thirty thousand dollars ($2,230,000), plus post-judgment interest to defrauded Pool Participants ("Restitution Obligation") within ten (10) days of the date of the entry of this Consent Order.  If the Restitution Obligation is not paid in full within ten (10) days of the date of entry of this Consent Order, then post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2006).

59.    To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendant's Pool Participants, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor shall collect restitution payments from Defendant and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

60.    Defendant shall make Restitution Obligation payments under this Consent Order to the Monitor in the name "Feisal Sharif – Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding. Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the

Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

61.     The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendant's Pool Participants identified by the Commission or may defer distribution until such time as the Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible Pool Participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part V.B. below.

62.     Defendant shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendant's Pool Participants to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments.  Defendant shall execute any documents necessary to release funds that he has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

63.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendant's Pool Participants during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

64.     The amounts payable to each Pool Participant shall not limit the ability of any Pool Participant from proving that a greater amount is owed from Defendant or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any Pool Participant that exist under state or common law.

65.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each Pool Participant of Defendant who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendant to ensure continued compliance with any provision of this Consent Order and to hold Defendant in contempt for any violations of any provision of this Consent Order.

66.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendant's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.  Civil Monetary Penalty**

67.     Defendant shall pay a civil monetary penalty in the amount of nine hundred thousand dollars ($900,000) ("CMP Obligation"), plus post-judgment interest, within ten (10) days of the date of the entry of this Consent Order.  Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2006).

68.     Defendant shall pay his CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be

made by means other than by electronic funds transfer, then the payment shall be made payable

to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN:  Accounts Receivables – AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment by electronic funds transfer is chosen, Defendant shall contact Linda Zurhorst or her

successor at the address above to receive payment instructions and **shall** fully comply with those

instructions.  Defendant shall accompany payment of the CMP Obligation with a cover letter that

identifies Defendant and the name and docket number of this proceeding.  Defendant shall

simultaneously transmit copies of the cover letter and the form of **payment** to the Chief Financial

Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street,

NW, Washington, D.C. 20581.

## VI.  MISCELLANEOUS PROVISIONS

69.    Notice:  All notices required to be given by any provision in this Consent Order

shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

> Rick Glaser
> U.S. Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street, NW
> Washington, DC 20581

Notice to Defendant:

> Feisal Sharif
> Branford, CT

All such notices to the Commission shall reference the name and docket number of this action.

70.     Change of Address/Phone:  Until such time as Defendant satisfies in full his Restitution Obligation and CMP Obligation as set forth in this Consent Order, Defendant shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten (10) calendar days of the change.

71.     Entire Agreement and Amendments:  This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

72.     Invalidation:  If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

73.     Waiver:  The failure of any party to this Consent Order or of any Pool participant at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or Pool participant at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

74.     Acknowledgements:  Upon being served with copies of this Consent Order after entry by the Court, Defendant shall sign acknowledgements of such service and serve such acknowledgements on the Court and the Commission within ten (10) calendar days.

75.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendant to modify or for relief from the terms of this Consent Order.

76.     Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendant, upon any person under his authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendant.

77.     Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

78.     Defendant understands that the terms of the Consent Order are enforceable through contempt proceedings, and that in any such proceedings, he may not challenge the validity of this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this *Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant Feisal Sharif.*

IT IS SO ORDERED on this 21st day of November 2013 in New Haven, Connecticut. Bridgeport


/s/ Stefan R. Underhill, USDJ

THE HONORABLE STEFAN R. UNDERHILL
UNITED STATES DISTRICT JUDGE


CONSENTED TO AND APPROVED BY:

Feisal Sharif
Defendant                                              Dated: 9/12/13


Amanda L. Harding                                      Dated: 11/18/13
James W. Deacon
Kenneth W. McCracken
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, D.C. 20581
Telephone: (202) 418-5968 (Harding)
Telephone: (202) 418-5526 (Deacon)
Telephone: (202) 418-5348 (McCracken)
Facsimile: (202) 418-5937
aharding@cftc.gov
jdeacon@cftc.gov
kmccracken@cftc.gov